UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
IRWIN SILVERBERG,

                                        Plaintiff,

                                                                    **OPINION AND ORDER**

                    - against -
                                                                     No. 15-CV-7129 (CS)

SML ACQUISITION LLC, and PROCESS
TECHNOLOGIES AND PACKAGING LLC,

                                        Defendants.
--------------------------------------------------------------------x

<u>Appearances</u>:
Jason Wolf
Rutkin & Wolf PLLC
White Plains, New York
*Counsel for Plaintiff*

Katherine Zalantis
Silverberg Zalantis LLP
Tarrytown, New York

Timothy P. Polishan
Kelley, Polishan & Solfanelli LLC
Old Forge, Pennsylvania
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 21.)  For the

following reasons, Defendants' Motion is GRANTED.

# I.    **BACKGROUND**

The following facts, which are based on Defendants' Rule 56.1 Statement of Material

Facts ("Ds' 56.1"), (Doc. 25), supporting materials and the record in this case, are undisputed

except where noted.[1]

## A.   The 2011 Agreement

Plaintiff Irwin Silverberg is the founder of San-Mar Laboratories ("San-Mar"), an FDA-

licensed pharmaceutical company that manufactures over-the-counter products.  (Silverberg Aff.

¶ 2.)  In 2011, Plaintiff sold San-Mar to an individual who continued the business under the

name SML Acquisition LLC ("SML").  (*Id.* ¶ 3.)  As part of the sale, (*id.*), Plaintiff entered into

a written consulting agreement with SML on December 2, 2011, (Zalantis Decl. Ex. 4 ("2011

Agreement")).[2]  The 2011 Agreement dictates that Plaintiff would be "retain[ed] for . . .

[Plaintiff's] know-how, experience and services," and would "perform such duties as may be

---

[1] Plaintiff failed to abide by Local Rule 56.1, which requires that a party opposing a motion for summary judgment "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried," and failed to abide by my Individual Practices, which require that a party opposing summary judgment reproduce each entry in the moving party's Local Rule 56.1 Statement and set out the opposing party's response directly beneath it.  Plaintiff's only factual contentions are contained in an Affidavit, (Affidavit of Irwin Silverberg ("Silverberg Aff."), (Doc. 28)), which provides his own narrative of the parties' relationship that led to this litigation, and the Statement of Facts in his Memorandum of Law, (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("P's Mem."), (Doc. 29), 2-7), neither of which corresponds to Defendants' Rule 56.1 Statement in any respect.  Moreover, even where one would expect there to be documents to support his allegations, Plaintiff's Affidavit does not cite to evidence in the record.  Further, Plaintiff's brief includes facts purportedly supported by the Silverberg Affidavit that are not mentioned in that Affidavit.  Ordinarily, I would be free to disregard Plaintiff's assertions in opposition and consider the facts set forth in Defendants' Rule 56.1 Statement, if supported by the evidence cited, as undisputed.  *See* Fed. R. Civ. P. 56(e)(2); Local Rule 56.1(c); *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998).  But I have "broad discretion to determine whether to overlook [Plaintiff's] failure to comply with local court rules."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).  Accordingly, despite Plaintiff's failure to properly adhere to Local Rule 56.1 and my Individual Practice 2(C)(i), I will, where appropriate in the interest of deciding the matter on the merits, consider material facts disputed if Plaintiff provides evidentiary support for his position.  In the future, however, I expect Plaintiff's counsel to comply with those provisions.  Further, where facts properly alleged in Defendants' 56.1 Statement are addressed only in Plaintiff's brief but are without record support, Plaintiff's version will be disregarded.  *See Wright v. Goldman Sachs & Co.*, 387 F. Supp. 2d 314, 318 (S.D.N.Y. 2005) (statement of facts in memorandum of law lacking citations to the record disregarded).

[2] "Zalantis Decl." refers to the Declaration of Katherine Zalantis in Support of Defendants' Motion for Summary Judgment.  (Doc. 22.)

determined and imposed from time to time by [SML]'s President or such other person directed by [SML]'s President" for no more than ten hours per month.  (*Id.* at 1-2.)  In exchange for his services, Plaintiff would receive "annual consulting fees" of $150,000 for four years, payable each month, and an additional $1,041.67 per month for "accrued expenses [Plaintiff] has incurred on the Company's behalf prior to the date hereof."  (*Id.* at 2.)  The 2011 Agreement included a clause providing that "[a]ny written modifications of this Agreement shall not be binding until and unless such written modification shall have been approved in writing by [Plaintiff] and by an authorized officer of [SML]."  (*Id.* at 9.)  The contract is governed by New York law.  (*Id.* at 8.)

SML made monthly payments totaling $176,041.04 to Plaintiff's consulting company, Silver RPH Services, LLC ("Silver RPH"),[3] through December 2012.  (Ds' 56.1 ¶¶ 21, 25; Zalantis Decl. Ex. 3, at 42:3-10; *id.* Exs. 9, 11.)  In May 2012, Defendant Process Technologies and Packaging LLC ("PTP") and SML entered into an Operating Agreement, pursuant to which PTP became SML's managing member with a 100% interest in SML.  (Zalantis Decl. Ex. 8.)  From January 2013 through February 2014, PTP paid at least $176,041.71 to Silver RPH pursuant to the 2011 Agreement.  (*See* Ds' 56.1 ¶¶ 21, 26.)  Defendants contend that the total paid by PTP in that period is $189,583.38 (Ds' 56.1 ¶¶ 21, 26), but Plaintiff states that he never received a payment for March 2013, (Silverberg Aff. ¶ 6).  Defendants assert that PTP issued a wire transfer for $13,541.67 to Silver RPH's checking account in March 2013, (Ds' 56.1 ¶ 21), and a transaction history for Silver RPH's account produced by Plaintiff, (*id.*), shows a corresponding March 2013 deposit, (Zalantis Decl. Ex. 11).  In total, Plaintiff received

---

[3] Plaintiff testified that he and Silver RPH are "one in the same," (Zalantis Decl. Ex. 3, at 42:11-14), and that Plaintiff directed that he be paid through his company, (*id.* at 41:11-23, 42:3-10).

$365,624.42 (including the disputed March 2013 payment), or $352,082.75 (excluding the disputed payment) under the 2011 Agreement.  (*Id.* Ex. 9.)  Plaintiff provided no consulting services to either SML or PTP under the 2011 Agreement.  (Ds' 56.1 ¶ 24.)  Neither side provided evidence as to whether Plaintiff was asked to do so.

    B.  <u>The 2014 Agreement</u>

    On February 25, 2014, Defendants sent a letter to Plaintiff's counsel stating that PTP would cease making payments under the 2011 Agreement because Plaintiff had failed to provide any consulting services and because Defendants were being sued by a New York State agency.  (Ds' 56.1 ¶ 42; Zalantis Decl. Ex. 14, at 5.)[4]  PTP did not issue payments to Plaintiff for the months of March, April and May 2014.  (Silverberg Aff. ¶ 7.)  At some point during those months, Plaintiff contacted Jay Benson, PTP's Chief of Staff, to discuss why the payments under the 2011 Agreement had ceased.[5]  PTP sent Plaintiff a letter on June 10, 2014, enclosing a consulting agreement "discussed on Monday 6/9/14," asking him to "make sure [he] ha[d] a full understanding of all enclosed in the agreement," and confirming that he would be coming to PTP's facility on June 16, 2014 to sign it.  (Ds' 56.1 ¶ 40; Zalantis Decl. Ex. 13; *id.* Ex. 3, at 42:15-43:20.)  Plaintiff does not contest that he received this letter, but testified that it was an example of the coercion he felt to enter into a new contract.  (Ds' 56.1 ¶ 41; Zalantis Decl. Ex. 3, at 43:17-20.)

---

[4] Plaintiff testified that he never received this letter, and that PTP stopped issuing checks with no notice.  (Zalantis Decl. Ex. 3, at 27:7-16.)  Defendants have produced emails with Plaintiff's counsel that show Plaintiff's counsel's awareness of the dispute.  (*Id.* Ex. 14.)

[5] The parties disagree as to the number of communications during this time period.  Benson testified that he notified Plaintiff before discontinuing payments under the 2011 Agreement, (Zalantis Decl. Ex. 10, at 47:21-49:5; *id.* Ex. 14), and spoke with Plaintiff "dozens" of times from as early as February or March 2014, (*id.* Ex. 10, at 51:7-10), while Plaintiff says that he could not reach anyone at PTP, or get an explanation why the payments had stopped, during March, April and May 2014, (Silverberg Aff. ¶¶ 7, 8).

On June 16, 2014, Plaintiff signed the new consulting agreement with PTP, dated June 10, 2014, (Zalantis Decl. Ex. 6 ("2014 Agreement")), and below the words "[i]n response to the above offer of employment," made a check mark next to the words "I accept," (Ds' 56.1 ¶ 10; Zalantis Decl. Ex 7, ¶¶ 5-7; *id.* Ex. 3, at 20:17-22:20). Benson, PTP's CEO W. M. Godfrey and PTP Human Resources Manager Mason Byers signed the 2014 Agreement on PTP's behalf. (Ds' 56.1 ¶ 11; 2014 Agreement 2.) The 2014 Agreement provided that in exchange for his consulting services, Plaintiff would receive an annual salary of $175,000 paid on a monthly basis, as well as a reimbursement of all "reasonable, necessary, and pre-approved travel, entertainment and other ancillary business expenses." (2014 Agreement 1.) Plaintiff also had the opportunity to earn a "pre-negotiated commission on sales." (*Id.*) The contract stipulated that it would commence June 1, 2014 and would end on June 1, 2015, (*id.*); if either party elected not to extend the agreement past June 1, 2015, it had to provide written notice to the other party by April 1, 2015, and if either party elected to cancel at any time thereafter, sixty days' written notice was required, (*id.* at 1-2). The contract provides that "[t]his agreement supersedes all prior and/or other agreements, contracts or other communication written or verbal. This specifically pertains to the prior document entitled 'Consulting Agreement' dated 02 November 2011 with SML Acquisitions, LLC."[6] (*Id.* at 2.)

Plaintiff testified that after he stopped receiving payments under the 2011 Agreement, he and his wife experienced severe stress and anxiety, (*see* Silverberg Aff. ¶¶ 9-12; Zalantis Decl. Ex. 3, at 27:7-16), which were harmful to their preexisting cardiac problems, (Silverberg Aff. ¶ 12). He further testified that he had to drain much of his savings and sell some stock to

---

[6] Although the 2014 Agreement refers to an agreement dated November 2, 2011 – rather than December 2, 2011, the date of the 2011 Agreement – the parties agree that this was a typographical error, and that the 2011 Agreement at issue here was the only 2011 consulting agreement between Plaintiff and SML. (Ds' 56.1 ¶ 9.)

account for the lack of income during March through May 2014. (Silverberg Aff. ¶ 12; Zalantis Decl. Ex. 3, at 27:22-28:2.) Benson had informed Plaintiff that he was considering suing Plaintiff for breach of contract, (Zalantis Decl. Ex. 10, at 51:17-18), thus presenting Plaintiff with the choice of signing a new consulting agreement or facing litigation, (*id.*; Silverberg Aff. ¶ 12). Defendants claim that Benson and Plaintiff exchanged drafts of the agreement, (Ds' 56.1 ¶¶ 45-48), and have provided drafts in which certain provisions regarding monthly payments and Plaintiff's travel needs were altered in Plaintiff's favor, (*see id.*; Zalantis Decl. Exs. 6, 15).[7]

Under the 2014 Agreement, Plaintiff "engage[ed] in sales related activity [and] contact[ed] various individuals with whom he had not previously been in contact for a number of years in an effort to solicit sales for PTP." (Ds' 56.1 ¶ 27; Zalantis Decl. Ex. 3, at 38:1-8, 40:21-41:6.) Defendants also fully performed under the second contract, making monthly payments in the amount of $14,583.33 to Silver RPH, (Silverberg Aff. ¶ 14), plus an additional expense reimbursement of $1,161.46, (Ds' 56.1 ¶ 30). Between the two agreements, Defendants paid a total of $556,369.17 to Plaintiff, or $542,827.50 excluding the contested March 2013 payment. (*See* Ds' 56.1 ¶ 22; Zalantis Decl. Ex. 9.)

On March 24, 2015, according to Defendants, PTP sent Plaintiff a letter stating that "this letter will serve to terminate the consulting agreement between PTP and Silver RPH Services LLC effective 6/1/15." (Benson Aff. ¶ 10; *id.* Ex. 16.)[8] The letter was sent via certified mail to the address Plaintiff provided PTP, but was returned to sender. (*Id.* ¶ 10; *id.* Ex. 17.) PTP then

---

[7] Plaintiff posits in his memorandum of law that he never negotiated the terms of the 2014 Agreement, but the only citation for this proposition is a reference to a paragraph in his Affidavit that does not address the issue. (P's Mem. 5 (citing Silverberg Aff. ¶ 11).) Plaintiff testified in his deposition that he did not receive more than one offer prior to signing the 2014 Agreement, (Zalantis Decl. Ex. 3, at 56:7-24), but does not explain why there exist multiple drafts of the 2014 Agreement. I will assume Plaintiff did not negotiate the 2014 Agreement, but the issue does not affect the outcome here in any event

[8] "Benson Aff." refers to the Reply Affidavit of Jay Benson. (Doc. 30.)

emailed the letter to Plaintiff on April 1, 2015, using the email address Plaintiff consistently used to communicate with PTP.  (*Id.* ¶ 12; *id.* Exs. 18-20.)  Plaintiff denies receiving any written notification that PTP intended to terminate or not extend the 2014 Agreement.  (Silverberg Aff. ¶ 15.)  According to Defendants, Plaintiff called Benson later that month, indicating that he was interested in renewing the agreement, (Benson Aff. ¶ 13), and followed up with an email, (*id.* Ex. 21), but Defendants were not interested, (*id.* ¶ 14; Silverberg Aff. ¶ 15).  Defendants' counsel sent Plaintiff a letter on June 5, 2015 stating that "no contract exists between [Plaintiff] and PTP," and requesting that Plaintiff "no longer call or write PTP or its officers, directors or other employees with repetitive assertions to the contrary."  (Silverberg Aff. ¶ 16; Wolf Decl. Ex. A.)[9]

C.  Procedural History

Plaintiff filed this lawsuit on September 10, 2015, seeking damages for breach of the 2011 Agreement.  (Doc. 1.)  The Complaint did not refer to or seek recovery under the 2014 Agreement.  Defendants filed an answer on November 19, 2015.  (Doc. 16.)  Discovery was conducted, and this motion followed.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

---

[9] "Wolf Decl." refers to the Declaration of Jason Wolf, (Doc. 32), which was filed in opposition to Defendants' motion for summary judgment.

counted." *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed

for purposes of the motion [or] grant summary judgment if the motion and supporting materials –

including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ.

P. 56(e)(2), (3).

Affidavits in opposition to a motion for summary judgment must be based upon

"concrete particulars, not conclusory allegations."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 451

(2d Cir. 1999) (internal quotation marks omitted).  "Statements that are devoid of any specifics,

but replete with conclusions, are insufficient to defeat a properly supported motion for summary

judgment."  *Id.* at 452; *see Major League Baseball Props.*, 542 F.3d at 310 ("A party opposing

summary judgment does not show the existence of a genuine issue of fact to be tried merely by

making assertions that are conclusory . . . .").

## III.    **DISCUSSION**

### A.  Superseding Contract

Plaintiff pleads a claim for breach of contract under the 2011 Agreement.  (Doc. 1.)  "To

establish a *prima facie* case for breach of contract, a plaintiff must plead and prove the existence

of a contract, a breach of that contract, and damages resulting from the breach."  *Genna v. Sallie*

*Mae, Inc.*, No. 11-CV-7371, 2012 WL 1339482, at *5 (S.D.N.Y. Apr. 17, 2012).  Defendants

argue Plaintiff fails on the first element because the 2014 Agreement superseded and replaced

the 2011 Agreement.  (Ds' Mem. 3.)[10]

"Under New York law, a written contract is to be interpreted so as to give effect to the

intention of the parties as expressed in the unequivocal language they have employed."

*Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000).  "[W]here a question of intention is

---

[10] "Ds' Mem." refers to Defendants' Memorandum of Law in Support of their Motion for Summary Judgment.
(Doc. 24.)

determinable by written agreements, the question is one of law, appropriately decided . . . on a motion for summary judgment." *Mallad Constr. Corp. v. Cty. Fed. Sav. & Loan Ass'n*, 298 N.E.2d 96, 100 (N.Y. 1973).

"It is well settled that the parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter." *Jones v. Trice*, 608 N.Y.S.2d 688, 688 (2d Dep't 1994); *see Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2d Cir. 2008) (mutually agreed upon contract superseded previous contract when agreement specifically so stated).  If a contract is terminated and superseded by another, "the new contract provides all of the parties' obligations and remedies for breach." *Penguin Grp.*, 537 F.3d at 200 (citing *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122, 125 (2d Dep't 1984), *aff'd*, 477 N.E.2d 1102 (N.Y. 1985)).  Indeed, "where the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement." *Northville Indus. Corp.*, 474 N.Y.S.2d at 125 (internal quotation marks omitted).

The Second Department's interpretation of the contracts at issue in *Northville Industries Corp.* is informative.  There a dispute arose between the parties related to services under a contract and as a result, they entered into a new agreement.  A clause in the second contract stated that "[t]his Agreement shall be in lieu of and shall supersede any other agreements existing as to the date hereof between [the parties]." *Id.* at 124.  The plaintiff sought recovery only under the first contract. *Id.*  After a denial of the defendants' summary judgment and a trial, the Appellate Division reversed, holding that the trial court should have granted the defendant's

motion for summary judgment because the language in the second contract "clearly and unequivocally provided that the [second] agreement was to be 'in lieu of' and would 'supersede' any other agreements . . . between the parties." *Id.* at 124-25. Similarly here, following a dispute between Plaintiff and PTP over the first contract, (*see* Zalantis Decl. Ex. 14), the parties entered into the 2014 Agreement, which explicitly states that it "supersedes all prior and/or other agreements, contracts or other communication written or verbal," and specifies the 2011 Agreement as superseded.[11] (2014 Agreement 2.) The clear and unequivocal language in the 2014 Agreement indicates the parties' intention to have the 2014 Agreement supersede the 2011 Agreement, thereby extinguishing any remedy under the 2011 Agreement.

Plaintiff makes several arguments in response. First, he contends that the modification clause in the 2011 Agreement – which states that "[a]ny written modification of this Agreement shall not be binding until and unless such written modification shall have been approved in writing by consultant and by an authorized officer of the Company," (2011 Agreement 9) – bars the 2014 Agreement from superseding the 2011 Agreement, (P's Mem. 10-11). Plaintiff focuses on the latter part of this provision – that a modification may only be approved "by an authorized officer of the Company" – and contends that because the 2011 Agreement was executed by an officer of SML, the officers of PTP who signed the 2014 Agreement were not "authorized" to enter into a modification of the earlier agreement. (*Id.*) Moreover, Plaintiff contends that there

---

[11] As noted above, the language in the 2014 Agreement refers to a contract dated "02 November 2011" with SML Acquisitions, LLC; the 2011 Agreement is dated December 2, 2011. A scrivener's error may be corrected through the use of parol evidence to establish mutual mistake. *See* Restatement (Second) of Contracts § 214(d); *see also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04-CV-10014, 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005) ("Parol evidence is admissible to correct a mutual mistake."). The parties agree that the 2011 Agreement is the only 2011 consulting agreement the Plaintiff ever had with SML. (Ds' 56.1 ¶ 9; Zalantis Decl. Ex. 3, at 7:6-8:11.) It is therefore undisputed that the agreement referenced in the 2014 Agreement is the 2011 Agreement.

is no indication that PTP was acting "on behalf of SML" when it signed the 2014 Agreement. (*Id.* at 11.)

These arguments fail. First, the 2014 Agreement is not a "modification," but rather a completely new agreement that supersedes and extinguishes the 2011 Agreement. But even if the 2014 Agreement were a mere "modification" of the 2011 Agreement, PTP is an "authorized officer" of SML. Plaintiff argues, without citing authority, that Defendants must show that signers of the 2014 Agreement were acting "in an official capacity for PTP *on behalf of* SML." (*Id.*) Even if that is the case, however, the undisputed facts show that PTP was acting "on behalf of" SML when it signed the 2014 Agreement.

"A parent corporation may become a party to its subsidiary's contract if the parent's conduct manifests an intent to be bound by the contract." *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940, 946 (S.D.N.Y. 1994). A party's intent may be inferred "if the subsidiary is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes." *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (1st Dep't 1997). PTP became the sole managing member of SML with a 100% membership interest in 2012. (Zalantis Decl. Ex. 8.) Under the Operating Agreement, PTP had authorization to  "exercise all the powers and privileges granted by . . . law or this operating agreement, together with any powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the business trade, purposes or activities of [SML]." (*Id.* § 2(a).) SML was a wholly-owned, inactive subsidiary of PTP, which possessed full power to act on SML's behalf, (Ds' 56.1 ¶¶ 12-13), thus making PTP a *de facto* party to the 2011 Agreement, given that SML had become a "dummy" and was wholly controlled by PTP for its own purposes, *see Horsehead Indus.*, 657 N.Y.S.2d at 633. Beginning in January 2013, PTP – as managing member of SML –

assumed the responsibility of paying Plaintiff under the 2011 Agreement, and continued to do so

until early 2014, (Zalantis Decl. Ex. 9; *id.* Exs. 11-12), manifesting its intent to be bound, *see*

*Warnaco*, 844 F. Supp. at 946.  PTP then ceased payments under the first contract between

Plaintiff and SML, (*id.* Ex. 10, at 48:14-49:5; *id.* Ex. 14), initiated correspondence with

Plaintiff's counsel and Plaintiff to discuss possible outcomes, (*id.* Ex. 14), and eventually entered

into the 2014 Agreement with Plaintiff, (*see* 2014 Agreement).  PTP and Plaintiff specifically

referenced the 2011 Agreement as being superseded by the 2014 Agreement, demonstrating that

they understood that PTP was acting in its capacity as managing member of SML when it

entered into the latter agreement.[12]  Indeed, on these facts it is hard to imagine how SML could

act at all, if not through PTP.

Plaintiff argues that even if the 2014 Agreement superseded the 2011 Agreement, he is

entitled to compensation for March, April and May 2014 – the months between Defendants'

cessation of payments on the 2011 Agreement and the signing of the 2014 Agreement.  (P's

Mem. 11-12.)  He argues that the language in the contract does not unambiguously manifest the

parties' intent that Defendants be released from liability under the 2011 Agreement.  (*Id.*)

Plaintiff refers to no applicable case law in support of his argument, citing only cases analyzing

releases.  *See Bank of Am. Nat'l Trust & Sav. v. Gillaizeau*, 766 F.2d 709, 713 (2d Cir. 1985)

(release from liability for loan); *Abramowitz v. N.Y. Univ. Dental Ctr., Coll. of Dentistry*, 494

N.Y.S.2d 721, 723 (2d Dep't 1985) (release from liability for improperly administered dental

procedure).  The issue here is different:  which contract is controlling, not whether the 2014

---

[12] Because I find that PTP had the authority enter into the 2014 Agreement, I need not consider whether the second contract represented a "unilateral consent" to cancel the first.  Plaintiff raised this notion in pre-motion correspondence, (*see* Doc. 14), but failed to respond to Defendants' arguments in their opening brief that it should be rejected, (*see* Ds' Mem. 6-10).  Plaintiff has thus apparently abandoned the idea.  Even if he had not, I agree with Defendants that even if PTP lacked authority to enter into the 2014 Agreement, Plaintiff consented to cancellation of the 2011 Agreement and both parties intended to be bound by the 2014 Agreement.  (*See id.* at 8-10.)

Agreement constitutes a release.  As previously discussed, if one contract is found to supersede another, all claims for liability must be brought under the latter contract.  *See Northville Indus. Corp.*, 474 N.Y.S.2d at 125.  Because the 2014 Agreement supersedes the 2011 Agreement, Plaintiff cannot seek recovery for March, April and May 2015 under the 2011 Agreement,[13] and I need not consider whether Defendants breached the 2011 Agreement.

## B. Economic Duress

Plaintiff further argues that even if the 2014 Agreement did supersede the 2011 Agreement, he is not bound by the 2014 Agreement because he entered into it under economic duress.  "[A] party seeking to avoid a contract because of economic duress shoulders a heavy burden."  *Pallonetti v. Liberty Mut.*, No. 10-CV-4487, 2011 WL 519407, at *5 (S.D.N.Y. Feb. 11, 2011) (internal quotation marks omitted).  "[T]he ability of a party to disown his obligations under a contract on [the basis of economic duress] is reserved for extreme and extraordinary cases."  *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 123 (2d Cir. 2001).  To establish economic duress under New York law, Plaintiff must show that there was "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative."  *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989) (internal quotation marks omitted); *accord Reid v. IBM Corp.*, No. 95-CV-1755, 1997 WL 357969, at *7 (S.D.N.Y. June 26, 1997).  Plaintiff has not met this burden.

Plaintiff alleges that he was threatened that he would not receive continued monthly payments under the 2011 Agreement unless he signed the 2014 Agreement, and that this threat was "unlawfully made."  Plaintiff cites to case law holding that a threat is unlawful when a party

---

[13] Plaintiff posits that because there is no statement of release in the 2014 Agreement, Defendants' summary judgment motion should be denied.  (P's Mem. 12.)  This argument fails because a superseding contract extinguishes rights under a superseded contract as a matter of law.  *See Northville Indus. Corp.*, 474 N.Y.S.2d at 125.

threatens to "breach an agreement by withholding performance unless the other party agrees to some further demand." (P's Mem. 13 (citing *Trustco Bank N.Y. v. MME Power Enters., Inc.*, 636 N.Y.S.2d 831, 832-33 (2d Dep't 1996)).) "Under New York law, [however,] threats to enforce a party's legal rights under a contract – or even that party's *interpretation* of its rights – cannot constitute a wrongful threat sufficient to establish a claim of economic duress." *Cooper Dev. Co. v. Friedman*, No. 92-CV-7572, 1994 WL 62846, at *4 (S.D.N.Y. Feb. 22, 1994) (emphasis in original), *aff'd*, 43 F.3d 1458 (2d Cir. 1994). Plaintiff has suggested that he did not breach the 2011 Agreement,[14] but he has not provided evidence suggesting that Defendants acted in bad faith in believing they could void it.[15]

In any event, even assuming Defendants had made an improper threat, Plaintiff has failed to present facts from which a reasonable jury could conclude that he lacked a practical alternative to signing the 2014 Agreement. Plaintiff could have refused to sign it and instead pursued his legal remedies under the 2011 Agreement. *See Wright v. Eastman Kodak Co.*, 445 F. Supp. 2d 314, 319 (W.D.N.Y. 2006) ("Every litigant or potential litigant who is considering whether to accept an offer of settlement has a choice to make: whether to settle the claim for a

---

[14] Plaintiff implies that he was not in breach of the 2011 Agreement because it was in contemplation of his life's work with SML, and the monthly payments were meant to support his retirement, (Silverberg Aff. ¶ 4; Zalantis Decl. Ex. 3, at 27:1-12), but this information was not memorialized in the contract, (*see* 2011 Agreement). It is well settled that "[t]he primary objective in interpreting a contract is to give effect to the intent of the parties 'as revealed by the language they chose to use.'" *Marmer Bros. Constr., LLC v. Midwest Steel, Inc.*, No. 99-CV-11681, 2000 WL 1341546, at *4 (S.D.N.Y. Sept. 18, 2000) (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). The 2011 Agreement only references Plaintiff's consulting obligations and SML's monthly payments in exchange; nowhere in the agreement does it state that Plaintiff was receiving this money as a sort of retirement payment. (*See* 2011 Agreement.)

[15] Further, where it is alleged that "the [w]rongful act [is] accomplished through lawful means[,] . . . [a] necessary element of [this] type of business compulsion . . . is a showing that the victim's financial straits were caused by the other party." *Nat'l Am. Corp. v. Fed. Rep. of Nigeria*, 448 F. Supp. 622, 644 (S.D.N.Y. 1978), *aff'd*, 597 F.2d 314 (2d Cir. 1979); *see U.S. West Fin. Servs., Inc. v. Tollman*, 786 F. Supp. 333, 338-40 (S.D.N.Y. 1992) (quoting *Nat'l Am. Corp.*, 448 F. Supp. at 644). Plaintiff has shown Defendants deprived him of three months' pay, but has not shown why – after a successful career and taking in at least $352,082.75 over the previous two-plus years – three missed payments caused such severe financial straits.

known sum, or to pursue litigation, which may offer the potential for a greater recovery, but also carries the risk of *no* recovery at all.") (emphasis in original); *see also Neuman v. Pike*, 591 F.2d 191, 194 (2d Cir. 1979) ("A threatened breach of contract for which there are adequate legal remedies does not constitute duress."); *Hellenic Lines Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 758 (2d Cir. 1967) (no duress where party "merely exercised its business judgment in a difficult situation").[16]

That Plaintiff was "forced to drain much of [his] savings," (Silverberg Aff. ¶ 12), is likewise unavailing.  Plaintiff has provided no bank statements or further support for this contention, and it is unclear why a three-month pause in payments would require such steps, considering that he received a total of $365,624.42 in the prior two years.  And Plaintiff nowhere states that he could not have afforded counsel to bring a lawsuit under the 2011 Agreement.  But assuming that he was forced to deplete his savings and sell stock, his hardship would not rise to the level of "economic duress" under New York law.  "A party raising duress must . . . do more than merely claim that the other party knew about and used his . . . poor financial condition to obtain an advantage in contract negotiations."  *DuFort v. Aetna Life Ins. Co.*, 818 F. Supp. 578, 582 (S.D.N.Y. 1993) (quoting *Austin Instrument, Inc. v. Loral Corp.*, 272 N.E.2d 533, 535-36 (N.Y. 1971)).  Plaintiff provides no evidence that Defendants knew of his alleged poor financial condition.  To the contrary, it would have been reasonable for Defendants to believe that Plaintiff was financially sound, given that they had paid him more than $350,000 over the past two-plus years, after he spent his career building a successful business, and he had had counsel contact

---

[16] To the extent Plaintiff argues he was under "tremendous stress," (Zalantis Decl. Ex. 3, at 27:7-16; *see* Silverberg Aff. ¶ 12), when he entered into the 2014 Agreement, leaving him with no alternative to signing the contract, such subjective psychological stress is insufficient to constitute economic duress.  *See Berman v. Parco*, No. 96-CV-375, 1996 WL 465749, at *8 (S.D.N.Y. Aug. 15, 1996) (individual's subjective, emotional state of mind is irrelevant because "duress involves an objective component").

them on his behalf.  (*See* Zalantis Decl. Ex. 14.)  "Rather, . . . the plaintiff must show that the defendant's actions 'deprived [him] of [his] free will,' and that 'the ordinary remedy of an action for a breach of contract would not be adequate.'"  *Id.* (alterations in original); *see VKK Corp.*, 244 F.3d at 123 ("Because an element of economic duress is . . . present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases.  Otherwise, the stronger party to a contract or release would routinely be at risk of having its rights under the contract or release challenged long after the instrument became effective."); *Farrell v. Title Assocs., Inc.*, No. 03-CV-4608, 2004 WL 5131862, at *6 (S.D.N.Y. Feb. 20, 2004) ("While the Court is sympathetic to [plaintiff's] need to buy groceries and pay rent, that need is legally inadequate to state a claim of duress."); *In re Marketxt Holdings Corp.*, 361 B.R. 369, 401 (Bankr. S.D.N.Y. 2007) (where debtor "could have chosen to file for bankruptcy at an earlier point," plaintiff could not "demonstrate that [it] had no alternative, at any time, than to accede to [the creditor's] demands").

Finally, and dispositively, "[a] contract entered into under duress is voidable, . . . not void," such that "even when a party satisfies all of the elements of duress, he must demonstrate that he promptly disaffirmed the contract."  *Eisenstein v. Kelly Music & Entm't Corp.*, No. 97-CV-4649, 1998 WL 289734, at *4, 6 (S.D.N.Y. June 4, 1998) (party cannot escape contractual obligations even if executed contract under duress, where party failed to disaffirm contract once alleged threat removed); *see Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 251 (2d Cir. 1985) (party must "act[] promptly to repudiate the contract" to void a contract on grounds of duress); *Sci. Holding Co. v. Plessey Inc.*, 510 F.2d 15, 23 (2d Cir. 1974) ("[O]ne who would repudiate a contract procured by duress must act promptly or will be deemed to have

17

elected to affirm it."); *VKK Corp.*, 244 F.3d at 123-24 ("If the releasing party does not promptly repudiate the contract . . . he will be deemed to have ratified it.").  The burden of proving economic duress "necessarily increases proportionately with the delay in initiating suit or otherwise repudiating the contract in question, since it is well established under New York law that a party asserting duress must do so promptly."  *Int'l Halliwell Mines, Ltd. v. Cont'l Copper & Steel Indus., Inc.*, 544 F.2d 105, 108 (2d Cir. 1976).

Apart from the fact that on the undisputed facts the elements of economic duress are not met here, there are no allegations from which I may infer that Plaintiff promptly attempted to revoke the 2014 Agreement.  *See Farrell*, 2004 WL 5131862, at *6 (finding no duress where plaintiff accepted benefits of the release and made no effort to revoke it until filing lawsuit approximately five months later).  To the contrary, Plaintiff accepted the full benefits of the 2014 Agreement – a total payment of $189,583.29 – and did not file the instant lawsuit until September 2015, nearly fifteen months after he signed the contract and three months after it lapsed.  *See Harless v. Research Inst. of Am.*, 1 F. Supp. 2d 235, 242 (S.D.N.Y. 1998) ("[I]f a party enters a contract under duress, once the duress is removed the party claiming duress must choose either to repudiate the contract promptly or to acquiesce to its terms pursuant to the doctrine of ratification.").

Having done so, Plaintiff is barred from now voiding it on the grounds of duress.  *See Davis v. Eastman Kodak Co.*, No. 04-CV-6098, 2007 WL 952042, at *6 (W.D.N.Y. Mar. 29, 2007) ("Where a release is voidable . . . the employee's subsequent decision to keep the consideration despite the defect operates to ratify the release."); *Farrell*, 2004 WL 5131862, at *6 (finding no duress where plaintiff accepted benefits of the release and made no effort to revoke until filed lawsuit approximately five months later); *Reid*, 1997 WL 357969, at *6 (no

economic duress where plaintiff accepted benefits and failed to tender back consideration received in return).

Because Plaintiff had alternatives to signing the contract – namely, commencing litigation against PTP to recover under the 2011 Agreement, something that he did only after receiving an additional $189,583.29 – and because he did not repudiate, and therefore ratified, the 2014 Agreement by accepting payments for a year, the 2014 Agreement is not voidable under an economic duress theory.

C.   Breach of the 2014 Agreement

Plaintiff raises the argument for the first time in its opposition papers to Defendants' motion for summary judgment that Defendants breached the 2014 Agreement by failing to provide to Plaintiff timely written notice of their intention to terminate the agreement at the end of the one-year term on June 1, 2015.  (P's Mem. 15-16.)  The Complaint, however, makes no mention of the 2014 Agreement, much less Defendants' alleged breach thereof.  (*See generally* Doc. 1.)  "A party may not use his or her opposition to a dispositive motion as a means to amend the complaint."  *Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)); *see Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-CV-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in . . . opposition papers . . . ."); *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407-08 (S.D.N.Y. 2000) ("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'") (quoting *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997)); *Caribbean Wholesales & Serv. Corp.*

*v. U.S. JVC Corp.*, 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) (raising new claim "is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion"); *see also Beckman*, 79 F. Supp. 2d at 408 ("'[L]eave to amend a complaint will generally be denied when the motion to amend is filed solely in an attempt to prevent the court from granting a motion . . . for summary judgment, particularly when the new claim could have been raised earlier.'") (omission in original) (quoting *Berman*, 986 F. Supp. at 217).  Accordingly, I need not consider Plaintiff's unpleaded claim that Defendants breached the 2014 Agreement.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the pending motion, (Doc. 21), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated: February 27, 2017
        White Plains, New York

_____
        CATHY SEIBEL, U.S.D.J.

20